**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **VICTOR FRANZONE**<br>**Plaintiff**<br><br>**v.**<br><br>**SCHMIDT BAKING COMPANY, INC., *et al.***<br>**Defendants** | **Civil Case No. 25-265** |

# MEMORANDUM

**HENRY, J.** **OCTOBER 19, 2026**

Plaintiff, Victor Franzone ("Franzone") brought this class action lawsuit against Defendants, Schmidt Baking Company, Inc. and Schmidt Baking Distribution, LLC (collectively "Schmidt") seeking monetary damages under the Fair Labor Standards Act, Pennsylvania Wage Payment and Collections Law and Pennsylvania Minimum Wage Act. Pending before me is the Motion to Compel Arbitration and Dismiss Collective and Class Allegations and, in the Alternative, Partial Motion to Dismiss filed by Schmidt. Franzone opposed the motion, and oral argument was held. I denied the motion to compel arbitration without prejudice and permitted the parties to conduct 30 days of limited discovery on the issue of whether the Distribution Agreement entered into by the parties was in fact a contract of employment. The parties did so, submitted supplemental briefing, and Defendants refiled their Motion to Compel Arbitration and Dismiss Collective and Class Allegations and, in the Alternative, Partial Motion to Dismiss. For the reasons that follow, Defendants' Motion to Compel Arbitration and Dismiss Collective and Class Allegations is granted in part and denied in part.

## I. BACKGROUND

Franzone is a resident of Pennsylvania and President of JDSA Inc. ECF 1 (“Compl.”) at ¶6; 14-1 (Defs’ Motion, “Mot.”) at 3; 14-2, Ex. 1-A (Distribution Agreement, “DA”) at 30. Through JDSA Inc., Franzone entered into a Distribution Agreement with Schmidt Baking Distribution, LLC for the distribution rights to a sales area located in and around Chalfont, Pennsylvania. DA at 32. The DA was entered into on November 11, 2020. *Id.* at 1. Schmidt requires all distributors to form a corporate entity to enter a DA, Compl. ¶ 30, and Franzone was no different. He stated that Schmidt supplied the paperwork for formation of his corporation, JDSA Inc., completed the forms on his behalf and charged him for the service. ECF 15-2, Franzone Declaration (“Decl.”) at ¶ 4.

Schmidt Baking Company Inc. is a Maryland corporation that develops, manufactures and markets bread and bread products to retailers and food service outlets for distribution. Compl. at ¶ 7. Schmidt Baking Distribution, LLC, is a limited liability corporation organized and existing under the laws of Maryland that is responsible for delivering products made by Schmidt Baking Co., Inc. to retailers in Pennsylvania and elsewhere. *Id.* at 8.

Section 2.3 of the Distribution Agreement entered into by JDSA and Schmidt addresses the relationship created by the agreement and provides that:

> The parties intend to create an independent contractor relationship and it is of the essence of this Agreement that DISTRIBUTOR be an independent contractor for all purposes. . . As an independent contractor, DISTRIBUTOR has the right to operate the business as it chooses, and shall bear all risks and costs of operating such business. . . .It is expressly understood that neither DISTRIBUTOR nor any of its agents or employees have any claim or right against SCHMIDT under any circumstances, to any benefits, protection, or other compensation furnished to employees in the traditional employer/employee relationship....

DA at 4. Section 4.1 of the Distribution Agreement discusses the results expected of the distributor and states:

> DISTRIBUTOR agrees to use its best efforts to develop and maximize sales of Products to Outlets within the Sales Area, by maintaining an adequate and fresh supply of Products in all Outlets; rotating Products to promote their sale before they become off code; promptly removing all off code Products; cooperating with SCHMIDT'S marketing programs, maintaining a computer assisted record-keeping system compatible with the system maintained by SCHMIDT now or in the future; and providing service on a basis consistent with good industry practice to all Outlets in the Sales Area requesting service…

DA at 10. Article 11 of the Distribution Agreement addresses dispute resolution. *Id*. at 23-26.

Section 11.1 of the Distribution Agreement provides that:

> Any dispute between SCHMIDT and DISTRIBUTOR arising out of the relationship created by this Agreement shall be subject to the dispute resolution provision set forth below.

*Id.* at 23. Section 11.2 of the Distribution Agreement addresses mediation and further provides, in relevant part, that:

> In the event of any dispute, either party may initiate a mediation procedure within five (5) days of the date on which facts respecting the dispute first come to such party's attention, by submitting a written request for mediation to the Judicial Arbitration & Mediation Services, Inc. ("JAMS") according to its procedures, or any other mediation service mutually agreed to by the parties according to such mediator's procedures. The mediation process shall begin promptly and shall conclude within ten (10) business days of the day the request for mediation is made, unless the parties mutually otherwise agree....

DA at 23. In addition, Section 11.3 of the Distribution Agreement addresses arbitration and provides that:

> If the parties are unable to resolve the dispute through mediation, either party may avail itself of the right to seek relief from an arbitrator, by filing a complaint within ten (10) business days following the conclusion of the mediation process, which period shall constitute an agreed time limitation, and such complaint shall be limited to the cause(s) of action within the scope of the mediation conducted in accordance with Section 11.2 above. Any dispute between the parties subject to this Article shall be decided by a neutral, binding arbitration conducted in accordance with the Judicial Arbitration and Mediation Services, Inc. ("JAMS"). The arbitration shall be conducted by one arbitrator and shall be held in Baltimore, Maryland. The arbitrator shall apply the substantive law specified in Section 12.8 of this Agreement, except that with respect to arbitration matters, the provisions of the Federal Arbitration Act shall be controlling. Judgment upon the

> award rendered by the arbitrator shall be final and binding and may be entered in any court having jurisdiction thereof.

*Id.* at 24-25. Section 11.7 of the Distribution Agreement contains a so-called "class action waiver" provision, which provides, in relevant part that:

> The parties agree that any proceeding in any forum to resolve any dispute, including mediation, arbitration, litigation, and/or government action involving DISTRIBUTOR, shall be conducted on an individual basis only, and not on a class-wide basis or as a representative action, collective action or a collective governmental action. The parties further agree that only SCHMIDT (and its affiliates and their respective owners, officers, directors, agents and employees, as applicable) and DISTRIBUTOR (and its affiliates and their respective owners, officers and directors, as applicable) may be the parties to any proceeding described in this Section, and that no such proceeding shall be consolidated, combined, or joined with any other proceeding involving SCHMIDT and/or any other persons without the written consent of all parties.

*Id.* at 26. Section 12.8 contains a choice of law provision, stating:

> The validity, interpretation and performance of this Agreement shall be controlled by and construed in accordance with the laws of the state of Maryland, without regard to its choice of law provisions.

*Id.* at 29. Lastly, the very last page of the Distribution Agreement contains a section labeled "Personal Guarantee" which states:

> The undersigned, as controlling shareholder of DISTRIBUTION CORPORATION, hereby unconditionally guarantees the full and complete performance by DISTRUBUTION CORPORATION of all the obligations assumed by it hereunder.

*Id*. at 30. This section is signed by Victor E. Franzone as Guarantor. *Id.*

Franzone was deposed in this matter on the limited issues of his duties under the DA, the work he personally performed pursuant to the DA and whether JDSA had any employees. Franzone testified that in 2019, he was employed by Shoehaul, Inc. and spoke with a Schmidt distributor and learned that he could "make good money" in the bread industry. Franzone Dep. Transcript ("Tr.") pp. 20-21, 36-37, 48-49. Franzone reached out

to Schmidt and no Sales Areas were available at that time, but when a Sales Area later became available, Franzone decided to take it. Tr. 49-52. Accordingly, Franzone incorporated JDSA Inc., as required by Schmidt, and JDSA purchased the Sales Area from B&C Distribution, Inc., for $107,110. *Id.* at 53, 56, 59-61, 101. It is undisputed that other than an attempt to run a small handyman service, Franzone had no experience running a business and had no prior experience forming a corporation. See Franzone affidavit (Aff.) at ¶¶ 2, 4 ECF 15-2; Tr. 29-30. It is also undisputed that Franzone required the assistance of Schmidt and another company, DSA, to incorporate and the cost was deducted from Franzone's settlement. Aff. at ¶ 4; Tr. 56-57. JDSA has no customers other than Schmidt and no other source of income, but nothing in the DA prevents JDSA from hiring employees. Tr. 196, 264.

Even though the DA gives JDSA "the right to operate [its] business as it chooses," DA at 4, Franzone claims that he does not really operate the business as he wants. Tr. 104. Specifically, Franzone testified that Schmidt controls the days and times of his operation, his prices, and where and when he delivers Schmidt product to his customers. Tr. 105. Schmidt can overrule the amount of product JDSA orders for its customers, effectively controlling the quantity of product that Franzone orders as well. Tr. 230-231. Schmidt also has the authority to issue a "Notice of Curable Breach" addressed to "Victor Franzone Rt. #804" with "Corporate Name: JDSA Inc." as a disciplinary mechanism when Schmidt believed Franzone was not properly servicing his area. ECF No. 33, Pl's Opposition to Mtn, Ex. 5.

Franzone himself has personally carried out every duty under the DA. The only exceptions to this were a Schmidt-approved floater that Franzone paid to cover two

vacations for him, Tr. 169-171, Mark Tifer, Schmidt's branch manager who drove Franzone around to his route one time after Franzone was provided a truck with a suspended registration, Tr. 242-243, and Phil Stephens, Schmidt district manager, who performed Wednesday and Sunday pack-outs at Franzone's stores for approximately a year, charging Franzone $20 per store. Tr. 174, 179.

In light of this evidence, Franzone alleges that Schmidt misclassified him and others in the putative class as independent contractors when in fact they were employees of Schmidt.

## II. LEGAL STANDARD

A motion to compel arbitration is governed either by the motion to dismiss standard of Rule 12(b)(6) or the motion for summary judgment standard of Rule 56. *Guidotti v. Legal Helpers Debt Resolution, LLC*, 716 F.3d 764, 773-774 (3d Cir. 2013). In this matter, I permitted a brief period of discovery as to the Distribution Agreement; therefore, there are factual disputes, and the summary judgment standard must be used.

## III. ANALYSIS

In this matter, Schmidt argues that Franzone, "through a corporate entity he created and owned," entered into the DA, that the DA contained arbitration provisions, and that the arbitration provisions are binding on Franzone. Mot. at 1. Schmidt also argues that the DA delegates to an arbitrator all disputes regarding whether the claims in Franzone's complaint are arbitrable, and that Franzone's collective and class action claims must be dismissed. In response, Franzone argues that there is not a valid agreement to arbitrate because section 1 of the Federal Arbitration Act applies to him and exempts him from the FAA and mandatory arbitration, and because the dispute resolution terms in the DA are unconscionable. ECF 15 (Plaintiff's

Opposition Brief, "Opp.") at 14, 23. Franzone also argues that the parties' dispute does not fall within the scope of the DA, and that Schmidt's motion to strike class allegations is improper. Opp. at 33, 27.

**A. The Federal Arbitration Act**

There is a "liberal federal policy favoring arbitration agreements," *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 (1991) (internal quotations omitted), and the FAA "enables judicial enforcement of a contract to arbitrate after the court 'hear[s] the parties' and is 'satisfied that the making of an agreement for arbitration . . . is not an issue." *Young v. Experian Info. Sols., Inc.*, 119 F.4th 314, 318 (3d Cir. 2024). In assessing whether there is an enforceable arbitration agreement, courts must determine whether the parties entered into a valid arbitration agreement and whether the dispute at issue falls within the scope of that agreement. *Century Indem. Co. v. Certain Underwriters at Lloyd's*, 584 F.3d 513, 523 (3d Cir. 2009). In line with the "liberal federal policy" in favor of arbitrations, "[t]here is a strong presumption of arbitrability." *Richards v. Am. Acad. Health Sys., LLC*, No. 20-59, 2020 WL 2615688, at *8 (E.D. Pa. May 22, 2020) (internal quotations omitted).

Federal courts apply state contract law to determine whether a valid arbitration agreement exists. In making this determination, the Court applies ordinary contract principles. *Brown v. Firstsource Advantage, LLC*, No. 17-5760, 2019 WL 568935, at *3 (E.D. Pa. Feb. 12, 2019). To determine which state's law applies, the Court looks to the choice-of-law rules of Pennsylvania, the forum state. See *Gay v. CreditInform*, 511 F.3d 369, 389 (3d Cir. 2007) (applying *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941) to federal question cases). Pennsylvania courts "generally honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them" unless either "(a) the chosen state has no substantial

relationship to the parties or transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to fundamental policy of a state which has a materially greater interest." *Brown*, 2019 WL 568935 at *3, n.1 (quoting *Gay*, 511 F.3d at 389) (internal citations omitted)). In this matter, because the DA contains a choice of law provision in §12.8 that states that the DA "will be construed in accordance with the laws of Maryland," and because Schmidt is located in Maryland, Maryland law must govern any contract formation issues regarding the DA. DA at 29.

The party seeking to enforce an arbitration provision has the burden of "proving its existence and initial validity," *Fuller v. Cabinetworks Michigan, LLC*, No. 24-1618, 2025 WL 2803561, at *1 (M.D. Pa. Oct. 1, 2025), while the party resisting arbitration has the burden of proving that "the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000) (citation omitted).

Although the FAA requires courts to enforce private arbitration agreements, it does contain an exemption to this enforcement requirement. Section 1 of the FAA states that it does not apply to "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. Franzone argues that he is a transportation worker engaged in interstate commerce and therefore, the § 1 exemption to the FAA applies and this Court has no authority to compel his claims to arbitration. In response, Schmidt argues that the DA was entered into by two corporate entities, JDSA and Schmidt, not by Franzone individually, and that a contract between corporate entities is not a "contract of employment" under § 1 of FAA. Defs' Reply Brief ("Reply") at 3-5.[1]

[1] I note that the United States Supreme Court recently held that in order to be engaged in interstate commerce for the purpose of the section 1 exemption, a worker is not required to cross state lines or interact with a vehicle that does. *Flowers Foods, Inc., et al, v. Brock*, 608 U.S. 380 (May 28, 2026.) In

### B. Was the Distribution Agreement a "Contract of Employment" Under Section 1?

As discussed above, Schmidt argues that Franzone does not fall under the "contracts of employment" exemption because the DA was entered into between Schmidt and JDSA Inc., not Schmidt and Franzone individually. In *New Prime, Inc. v. Oliveira*, the Supreme Court examined what qualifies as a "contract of employment" under the FAA. 586 U.S. 105, 113 (2019). In *New Prime*, Oliveira was a driver for a trucking company who worked under an operating agreement that labeled him an independent contractor and contained a mandatory arbitration provision. 586 U.S. at 108. In asserting that the section 1 exemption to the FAA was inapplicable, the company argued that "contracts of employment" referred only to contracts that establish an employer-employee relationship and not to contracts with independent contractors. *Id*. at 109. The Supreme Court disagreed with that interpretation, finding that, at the time of the FAA's adoption in 1925, "a 'contract of employment' usually meant nothing more than an agreement to perform work," and that the term "contracts of employment" should be understood "in a broad sense to capture any contract for the performance of *work* by *workers*." *Id*. at 114, 116 (emphasis in original).

Further, in *SW Airlines Co. v. Saxon*, the Court observed that the use of the words "workers" and "engaged" in § 1 of the FAA "directs the interpreter's attention to the *performance* of work" and "emphasizes the actual work that the members of the class, as a whole, typically carry out." 596 U.S. 450, 456 (2022) (emphasis in original, internal quotations marks omitted). *New Prime* and *SW Airlines* both applied the transportation worker exemption in § 1 of the FAA and emphasized function over form, which supports Franzone's argument that he is a "worker" under § 1 in function, even though he did not personally enter into the DA.

---

this matter, Schmidt does not dispute that Franzone played a role in interstate commerce (Reply at 3 n.4). Accordingly, the first part of the section 1 exemption is satisfied.

Keeping this guidance in mind, I must interpret the phrase "contracts of employment" under section 1 to determine whether the DA at issue is such a contract between Franzone and Schmidt, despite the fact that it was not signed by Franzone in his individual capacity. I note that there is conflicting authority on the issue of whether a business-to-business contract can qualify as a contract of employment. First, the exact same DA at issue in this case has been analyzed by two different courts with differing results. In *Gray v. Schmidt Baking Company, Inc.*, No. 22-463, 2023 WL 9285466 (D.Md. Oct. 16, 2023), the Court analyzed the same Distribution Agreement entered between Schmidt and a corporation formed by Gray. The Court found that agreements between two business entities are not "contracts of employment" within the context of Section 1 of the FAA and ordered Plaintiff's case to proceed to arbitration. *Gray*, 2023 WL 9285466, at *3.

Next, in *Silva v. Schmidt Baking Company* ("*Silva I*"), a different district court examined the same Distribution Agreement between Schmidt and the corporation formed by Silva, another distributor. This Court too found that the distribution agreements did not constitute "contracts of employment" under § 1. *Silva I*, 732 F.Supp.3d 194 (D.Conn. May 2, 2024). The district court then permitted interlocutory appeal on the question of, *inter alia*, "whether an individual worker . . . falls within the scope of the [section 1 exemption] even if his contract to perform work is signed by an LLC," *Silva v. Schmidt Baking Distribution, LLC* ("*Silva II*"), No. 23-1695, 2024 WL 3566168 (D. Conn. July 29, 2024). In its order granting interlocutory appeal, the District Court stated that it believed its ruling was a correct application of §1, but then "acknowledge[d] that the actual work performed by workers under business-to-business contracts may be functionally indistinguishable from the work done in employment relationships, and that [the

Court's] decision creates a potential loophole that could undermine § 1's purpose." *Silva II*, 2024 3566168, at * 4.

On appeal, the Second Circuit discussed the history of the FAA and its passage. *Silva v. Schmidt Baking Distribution, LLC* ("*Silva III*"), 162 F.4th 354, 359 (2d Cir. Dec. 22, 2025), *cert denied*, 146 S.Ct. 2661 (2026). The Court stated that *New Prime's* finding that the definition of "contract of employment" in the FAA when it was passed in 1925 referred to "nothing more than an agreement to perform work" left the Second Circuit with "little room to exclude a contract from the §1 exemption solely because it is between businesses." *Silva III*, 162 F.4th at 360 (quoting *New Prime*, 586 U.S. at 114). The Court went on to state:

> [J]udicial opinions from the time of the FAA's enactment provide numerous and diverse examples of courts using the term "contract of employment" to refer to contracts for work between business entities; these include contracts between corporations, partnerships, and labor unions. As such, we cannot conclude that a contract is not a "contract of employment" merely because it is signed by business entities. A careful reading of the statute's text confirms this conclusion. Congress specifically enacted the phrase "contracts of employment *of*" workers, not "contracts of employment *with*" workers. Had Congress intended to omit contracts between business entities from the § 1 exception, it could easily have done so.

*Silva III,* 162 F.4th at 360–61 (internal citations omitted). Ultimately, the *Silva III* Court looked at the substance of the DA, not "its formalities," and found that the DA was a contract of employment within the meaning of §1. *Id*. at 362. The Court recognized a distinction between individual transportation workers who were required to incorporate to perform services, as opposed to logistics companies with a significant number of employees who worked in transportation. *Id*. The Court noted that "contracts for transportation work between sizeable business entities with many employees do not fall within the scope of the §1 exemption." *Id*. at 362-63. The Supreme Court declined to hear Schmidt's appeal from *Silva III*. *Schmidt Baking Distrib., LLC, v. Silva*, 146 S.Ct. 2661 (May 18, 2026).

Earlier this year, a Court in the District of Massachusetts had an opportunity to examine a similar set of facts, where a plaintiff transportation worker was required to form a corporation, of which she was the only member, to contract with the defendant company. *Martins v. Capstone Logistics, LLC*, No. 24-10357, 2026 WL 252401 (D. Mass. Jan. 30, 2026). In examining the §1 exemption to the FAA, the Court there "decline[d] to adopt a bright-line rule that agreements involving business entities may never create a contract of employment." *Martins*, 2026 WL 252401, at *9. Ultimately, the Court found that the §1 exemption applied to the plaintiff, stating where "a plaintiff is forced to create a sham corporation to facilitate a defendant's attempted runaround of the transportation worker exemption, it is appropriate to treat the individual plaintiff and her corporate entity interchangeably." *Id*. at *10.

However, there is certainly authority holding to the contrary. The Fourth, Sixth and Ninth Circuits have all found that contracts between corporate entities are not §1 contracts of employment. *Fli-Lo Falcon, LLC v. Amazon.com, Inc.*, 97 F.4th 1190, 1195 (9th Cir. 2024) (finding that § 1 exemption did not apply to non-natural persons like plaintiff business entities); *Tillman Transp., LLC v. MI Bus., Inc.*, 95 F.4th 1057, 1061-64 (6th Cir. 2024) (affirming that "commercial contract between two business entities is not a contract of employment."); *Amos v. Amazon Logistics, Inc.*, 74 F.4th 591, 596 (4th Cir. 2023) (holding that an agreement between Amazon and a corporate plaintiff was not a "contract of employment" because "it did not promise work and compensation to an individual employee," but required "certain business services to be provided by one business to another..."). Further, numerous district courts have held the same in circumstances where a business entity plaintiff attempted to avoid arbitration by invoking §1 of the FAA. *Peltier v. Lepage Bakeries Park St. LLC*, No. 24-452, 2025 WL 871603, at *3 (D.R.I. Mar. 20, 2025); *ShaZor Logistics v. Amazon.com, LLC,* 628 F. Supp. 3d

708, 712 (E.D. Mich. 2022); *R & C Oilfield Servs., LLC v. Am. Wind Transp. Grp., LLC*, 447 F. Supp. 3d 339 (W.D. Pa. 2020); *D.V.C. Trucking, Inc. v. RMX Glob. Logistics, Inc.*, No. 05-705, 2005 WL 2044848, at *3 (D. Colo. Aug. 24, 2005); *Porteous v. Flowers Foods, Inc.*, 766 F.Supp.3d 1093, 1105 (D. Ore. Feb. 12, 2025); *Canales v. Lepage Bakeries Park St. LLC,* 596 F.Supp.3d 261, 268 (D. Mass. Mar. 30, 2022) (aff'd on appeal, 67 F.4th 38 (1st Cir. 2023).[2]

There is no controlling Third Circuit precedent on this issue. Accordingly, I must follow the guidance of the Supreme Court and interpret the term "contract of employment" "in a broad sense to capture any contract for the performance of *work* by *workers*." See *New Prime*, 584 U.S. at 116 (emphasis in original). In examining the facts of record regarding the actual work completed by Franzone pursuant to the DA and using this interpretation to focus on the performance of work, not the technicalities of the DA, I decline to find that Franzone is not an employee of Schmidt merely because the DA was entered into by two business entities. After examining the facts of Franzone's relationship with Schmidt and the DA itself, I find that Franzone entered into a contract of employment with Schmidt when he executed the Distribution Agreement.

Following the clear instruction from the Supreme Court in *New Prime*, I must look to the substance of the DA, not its formalities, to determine whether it is a "contract of employment" for purposes of §1. Schmidt disagrees with an examination of anything outside of the DA,

---

[2] I note that several of these cases that found DAs between business entities are not employment contracts are distinguishable from the instant set of facts because the plaintiff corporate entity was comprised of numerous employees, not just one individual worker like Franzone. See *Fli-Lo Falcon*, 97 F.4th at 1192 (corporate plaintiff hired multiple individuals to deliver packages); *Amos*, 74 F.4th at 593 (corporate plaintiff employed approximately 450 drivers); *ShaZor Logistics*, 628 F.Supp.3d at 711 (corporate plaintiff was a Delivery Service Party for Amazon, and a typical DSP has "a fleet of approximately 20-40" vehicles). But see *Peltier*, 2025 WL 871603 (individual owner of corporate entity who had entered into a distribution agreement with defendant did not fall under §1 exemption). I also note that both the *Fli-Lo* and *Amos* courts recognized that there may be "circumstances under which a business entity could qualify for the transportation worker exemption." *Fli-Lo*, 97 F.4th at 1202 (Thomas, J. concurring); *Amos*, 74 F.4th at 597.

arguing that the sole issue is whether the DA is a contract of employment, and any evidence outside of the DA that Franzone believes shows that he is misclassified is irrelevant. Defs' Supp. Brief, ECF No. 31, p. 1. However, this argument goes against what the Supreme Court stated in *New Prime*, where it said that "Congress used the term 'contracts of employment' in a broad sense to capture any contract for the performance of *work* by *workers*," whether a contract of employment "signaled a formal employee-employer" relationship or not. *New Prime*, 586 U.S. at 116 (emphasis in original). Therefore, I must examine the work actually performed by Franzone under the DA, not just the terms of the DA itself, and I must interpret the term "contracts of employment" broadly.

First, it is telling that Schmidt **required** Franzone to form a corporation prior to purchasing a sales area. Franzone had a high school education, had no idea what a corporation did or what its benefits were, had never formed a corporation before and would not have formed JDSA if Schmidt had not required it. He had attempted to run a handyman business that was ultimately unsuccessful prior to entering into the DA, but other than that, Franzone was not a sophisticated businessman who chose to create JDSA to shield his personal assets or take advantage of certain tax deductions. Rather, Franzone wanted to purchase a sales area, and Schmidt told him that to do so, he needed to form a corporation. I am left with the conclusion that Schmidt forced Franzone to create JDSA before purchasing the sales area because it would provide some benefit to Schmidt.

JDSA had no employees, no clients other than Schmidt and received no income from anyone other than Schmidt, although Franzone does not dispute the fact that the DA did not forbid JDSA from providing services to other companies. For well over five years, Franzone personally performed virtually every duty required by Schmidt pursuant to the DA. Franzone

personally drove to Schmidt's Chalfont, PA depot, picked up Schmidt baked products, loaded his truck with racks and trays supplied by Schmidt, drove his route, put Schmidt products out on Schmidt-approved shelves in stores, rotated and removed inventory and kept track of the inventory ordered. Those are the duties of an individual delivery driver performing transportation work.

It is true that the DA permitted JDSA to hire employees to perform the work set forth in the DA. However, there is no dispute that Franzone himself personally performed the vast majority of the work and brings claims based upon the work that he personally performed. There were a few instances of record when Franzone had individuals fill in for him or assist him. Two of the three individuals who assisted Franzone were, in the case of Mark Tifer and Phil Stephens, employees of Schmidt, not JDSA. Further, Franzone testified about paying a floater to cover two vacations which totaled approximately three weeks over the course of his numerous years with Schmidt and also testified that his son rode along with him a few times, unpaid. I find neither of those situations sufficient to show that there was not an employment relationship between Schmidt and Franzone. The fact that a floater and not Franzone performed the duties required by Schmidt for approximately three weeks out of more than five years of Franzone and Schmidt's relationship is insufficient to defeat Franzone's argument that the DA is an employment contract.

There are several additional noteworthy aspects of the relationship between Franzone and Schmidt that support the fact that the DA is an employment contract. First, JDSA had no real control over how much product was ordered from Schmidt for stores on its sales route. Franzone testified that for certain products, Schmidt would review the order that he had placed and either round the number of ordered products up so it equaled a full tray or adjust it up to a number that it deemed to be appropriate. Tr. 230-231. Further, Franzone testified as follows:

> They (Schmidt) control everything I can do. I mean, I don't operate, I don't operate as an independent contractor. That's where the issue lies. My days, my days of operation are controlled; my times are controlled, with little flexibility; they control all my prices; they control the space I put it; they control the times with their customers, when I gotta be there by.

Tr. 105.

Also, Schmidt issued what it called notices of curable breach to "Victor E. Franzone, Rt # 804" with "Corporate Name JDSA Inc." See ECF No. 34, Ex. 5. These notices set forth issues Schmidt had with the work that Franzone performed pursuant to the DA, cited to the DA and demanded that Franzone fix the issues within 3 business days under threat of termination of the DA. Next, all correspondence from Schmidt to Franzone was addressed to Franzone's personal email address, not a JDSA email account. All of this evidence together lends strong support to Franzone's contention that he entered into an employment contract with Schmidt when he signed the DA.

In arguing that the DA did not create an employment relationship with Franzone, Schmidt first argues that the DA does not address the particulars of the duties that Franzone and JDSA had to perform under the DA and the DA does not contain any terms for payment of wages or benefits to Franzone. However, as discussed above, the formalities of the DA are not what I am to examine in determining if the DA is an employment contract, so these things are irrelevant.

Next, Schmidt argues two additional related things: the value of Franzone's sales area has increased since he purchased it, and Franzone sold some of his stops to other distributors and got to keep the money from those sales. According to Schmidt, this is evidence that the DA is not an employment contract, as an employee could not sell off part of its sales territory and keep the income from that sale, nor would an employee be entitled to the increased value in his sales area. As to Franzone's sales of two of his stops, he testified that Schmidt was "calling up drivers to

talk them into selling stops…I'm basically being forced into making the decision or failing my Distribution Agreement with their expectations." Tr. 224-225. Basically, Schmidt pressured Franzone into selling stops when he couldn't keep up with Schmidt's expanded capacity. Although Franzone got to retain the money from these stop sales, the sales were not an independent decision that he reached without input from Schmidt as an independent distributor would do. Further, it is irrelevant that the route appreciated in value, as both an employee and a distributor would be concerned with the value of their sales route, as that value is determined based upon the amount of sales and is indicative of their success or failure. Neither of these two arguments defeat the factual finding that the DA is in fact a contract of employment between Schmidt and Franzone.

Consistent with a functional view of the relationship between Franzone and Schmidt, as well as the Supreme Court's directive that contracts of employment should be understood to include "any contract for the performance of *work* by *workers*," *New Prime*, 586 U.S. at 116 (emphasis in original), I find that the DA qualifies as a contract of employment and Franzone, as a transportation worker, is subject to § 1 of the FAA. As in the recent *Martins* decision, I find that where a plaintiff such as Franzone is "forced to create a sham corporation to facilitate a defendant's attempted runaround of the transportation worker exemption, it is appropriate to treat plaintiff and [his] corporate entity interchangeably." 2026 WL 252401, at *10. Therefore, as section 1 of the FAA applies to exempt Franzone from arbitration, Schmidt's motion to compel arbitration will be denied.[3]

[3] I note that the DA contains a "personal guarantee" that states Franzone "unconditionally guarantees the full and complete performance by [JDSA Inc.] of all the obligations" contained in the DA. DA at 30. This guarantee requires Franzone to personally guarantee the work to be performed in the DA. This type of clause would not exist in a business-to-business contract, as no corporate entity could "personally" guarantee the performance of contracted-for work. So although the DA does not prevent Franzone from hiring employees to help him with the distribution of Schmidt products, it does require him to be

**C. If Section 1 Applies, Should Arbitration be Compelled Pursuant to State Law?**

Schmidt next argues that if Section 1 of the FAA applies to Franzone and he cannot be compelled to arbitrate his claims, he can alternatively be compelled to arbitration under state law. Schmidt argues that the arbitration agreement is enforceable under Maryland state law and the Maryland Uniform Arbitration Act ("MUAA"), which does not include a state law equivalent to the transportation worker exemption. Based upon the explicit language of the DA, I find this argument to be unpersuasive.

It is true that if "state law grounds exist that would permit the enforcement of an arbitration provision then an analysis under the FAA is unnecessary." *Nelson v. Gobrands, Inc.*, No. 20-5424, 2021 WL 4262325, at *5 (E.D. Pa. Sept. 20, 2021). It is also true that the DA specifies that its "validity, interpretation and performance" be "controlled and construed in accordance with the laws of the state of Maryland." DA at 29. However, Section 11.3 of the DA states that "the arbitrator shall apply the substantive law specified in Section 12.8 (Maryland choice-of-law provision) of this Agreement, **except that with respect to arbitration matters, the provisions of the Federal Arbitration Act shall be controlling**." *Id.* at 24-25 (emphasis added).

Despite Section 12.8 specifying application of Maryland law and Schmidt's argument to the contrary, the language contained in Section 11.3 shows that the DA is expressly controlled by the FAA and actually **prohibits** the application of state law to arbitration matters. In drafting the DA, Schmidt designated the FAA as the governing law concerning all issues "with respect to

personally responsible for the work to be done under the contract. This also weighs in favor of the DA being an employment contract between Schmidt and Franzone. I note that Schmidt claims Franzone failed to argue that the DA required him to do the work personally pursuant to the "Personal Guarantee" and therefore, this argument is waived. Reply at 5. However, because I have found that the DA is in fact a contract of employment without considering the personal guarantee, I do not need to address this argument.

arbitration matters," thereby specifically **excluding** the law of Maryland from applying to those issues. Thus, if the FAA does not apply because of the application of the § 1 exemption, there is no contractual basis for applying some other body of law to compel arbitration. In short, there is simply no agreement to permit consideration of the "arbitration matter" under any state law. To the contrary, Schmidt, as the drafter of the DA, expressly selected the Federal Arbitration Act as the sole and controlling law governing their arbitration agreement and excluded application of its Maryland choice-of-law provision to that portion of the agreement. Therefore, the MUAA does not apply and cannot be used to compel this matter to arbitration.[4]

**D. Should the FLSA Collective and Rule 23 Class Allegations be Dismissed?**

Franzone asserts both a collective action under the FLSA for individuals who worked as distributors for Schmidt pursuant to a DA, and a Rule 23 class action with respect to the remainder of the claims in his Complaint. Compl, ¶¶ 1, 41, 49. As set forth above, Section 11.7 of the DA states that "any proceeding in any forum to resolve any dispute, including mediation, arbitration, litigation, and/or government action involving DISTRIBUTOR, shall be conducted on an individual basis only, and not on a class-wide basis or as a representative action, collective action or collective governmental action." DA at 26. Schmidt argues that Franzone cannot meet the requirements for collective or class certification due to the existence of this waiver in the DA, and his class and collective claims must be dismissed.

[4] I note that in the *Silva II* decision on Schmidt's motion for interlocutory appeal, Schmidt made this identical argument regarding the MUAA. *Silva II,* 2024 WL 3566168. Although not reaching an ultimate decision on the issue, in response to Schmidt's contention that even if § 1 applied to Silva, he still may be required to arbitrate pursuant to the MUAA, the Court noted the language set forth above in Section 11.3 of the DA regarding the FAA being the controlling authority for arbitration matters and stated that "it seems unlikely that the MUAA would pose an additional bar to Plaintiffs' ability to litigate these issues." *Silva II*, 2024 WL 3566168, at *5 n. 3.

Courts are generally reluctant to strike class action allegations before the parties conduct discovery or before a motion to certify is before the court. *See Ricciardi v. Elec. Data Sys. Corp.*, No. 03–5285, 2005 WL 2782932, at *1 (E.D.Pa. Oct.24, 2005). However, a court "will strike class action allegations without permitting discovery or waiting for a certification motion where the complaint and any affidavits clearly demonstrate that the plaintiff cannot meet the requirements" for a class action. *Woodard v. FedEx Freight E., Inc.*, 250 F.R.D. 178, 182 (M.D. Pa. 2008); see also *Thompson v. Merck & Co., Inc.*, No. 01–1004, 2004 WL 62710, at *2 (E.D.Pa. Jan.6, 2004).

By its plain terms, the DA prevents Franzone from proceeding in **any** forum to resolve **any** dispute (including "litigation") on anything other than an individual basis. See DA at 26. The waiver is certainly applicable to the instant action, as it states that it applies to "any proceeding in any forum," including "litigation." DA at 26. Franzone clearly cannot meet the requirements for a class or collective action under the terms of the DA. However, the question then becomes whether the law permits a waiver of the right to class and collective actions.

Under Maryland law, which must be applied here pursuant to the DA, "an express waiver of the right to collective action will be enforced, even if it increases the expense of pursuing a claim." *Rose v. New Day Fin., LLC*, 816 F.Supp.2d 245, 254 (D. Md. 2011) (footnote omitted) (citing *Walther v. Sovereign Bank*, 872 A.2d 735, 750-51 (Md. 2005)).[5] Therefore, it is clear that the law of Maryland does not bar this type of waiver.

---

[5] Even if I applied Pennsylvania law to this issue, the result would be the same, as numerous Pennsylvania courts have held that class action waivers **not** contained in arbitration provisions are enforceable. See *Korea Week, Inc., v. Got Capital, LLC*, No. 15-6351, 2016 WL 3049490 (E.D. Pa. May 27, 2016); *Crews v. TitleMax of Delaware, Inc.*, No. 22-168, 2023 WL 2652242 (M.D. Pa. Mar. 27, 2023); *Vaughn v. Pittsburgh Fondue, LLC,* No. 19-1104, 2021 WL 2952902 (W.D. Pa. July 14, 2021); *Delaney v. FTS Int'l Servs., LLC*, No. 16-662, 2017 WL 264463 (M.D. Pa. Jan. 20, 2017).

Further, it is irrelevant to the analysis of the class action waiver that I found Franzone is exempt from arbitration pursuant to the FAA, because the class and collective waiver is distinct from the arbitration provisions of the DA. This is evidenced by the fact that arbitration and waiver of class and collective actions are addressed separately in the DA in different sections with different headings. See DA at 24, 26 (§11.3 ARBITRATION vs. § 11.7 INDIVIDUAL ACTION). Also, the waiver found in §11.7 specifically encompasses "any proceeding in any forum," not just arbitration. Lastly, there is extensive caselaw from courts in different circuits finding that class action waivers with arbitration clauses are enforceable even if the agreement to arbitrate is not. See *Rogers v. 3 Bear Energy, LLC*, No. 21-376, 2023 WL 6464107 (D.N.M. Oct. 4, 2023); *Naranjo v. Nick's Mgmt., Inc.*, 652 F.Supp.3d 737 (N.D. Tex. 2023); *Figueredo-Chavez v. RCI Hospitality Holdings, Inc.,* 574 F.Supp.3d 1175 (S.D. Fla. 2021); see also *Korea Week, Inc., v. Got Capital, LLC*, 2016 WL 3049490, at *9 (E.D. Pa. May 27, 2016) (finding that class action waivers outside of arbitration agreements are enforceable); *Vaughn v. Pittsburgh Fondue, LLC*, 19-1104, 2021 WL 2952902 (W.D. Pa., July 14, 2021) (finding that an employee's collective action waiver under the FLSA is enforceable).

Based on the foregoing, I find that the collective action waiver contained in the DA is independently enforceable and the DA waives Franzone's right to bring a class or collective action in either arbitration or court. Franzone is therefore prevented from maintaining those claims in the instant matter and I will grant Schmidt's motion seeking to strike the collective and class allegations from Franzone's Complaint.

**E. Should Plaintiff's Claim Under the PWPCL Be Dismissed?**

The Pennsylvania Wage Payment and Collection Law, 43 P.S. § 260.1 *et seq.*, is intended to allow employees to recover wages and other benefits that are due from employers pursuant to

agreements between the parties. "WPCL does not create a right to compensation. Rather, it provides a statutory remedy when the employer breaches a contractual obligation to pay earned wages. The contract between the parties governs in determining whether specific wages are earned." *Weldon v. Kraft, Inc.*, 896 F.2d 793, 801 (3d Cir. 1990) (citations omitted).

As already discussed, Franzone entered into an employment contract with Schmidt and therefore, the DA would qualify as an agreement between the parties under the WPCL. Further, Franzone claims that Schmidt took improper deductions from his pay. Compl., ¶¶ 14, 24, 71, 72. Accepting the allegations in the Complaint as true, as I must in the context of a motion to dismiss, I find that Franzone has set forth sufficient allegations to permit his WPCL claims to proceed.

**F. Should the Claims for Unjust Enrichment and Quantum Meruit Be Dismissed?**

Lastly, Franzone's Complaint sets forth causes of action for unjust enrichment and quantum meruit, "in the alternative." A plaintiff is permitted to plead alternative theories of recovery based on breach of contract and unjust enrichment in cases where there is a "question as to the validity of the contract in question." *AmerisourceBergen Drug Corp. v. Allscripts Healthcare, LLC*, No. 10–6087, 2011 WL 3241356, at *3 (E.D.Pa. July 29, 2011) (dismissing a claim for unjust enrichment where neither party contested the validity of contract). Where the existence of a contract is uncertain, pleading in the alternative is permitted, even though a plaintiff cannot recover under both theories. See *Alpart v. Gen. Land Partners, Inc.*, 574 F.Supp.2d 491, 507 (E.D.Pa.2008) (denying motion to dismiss unjust enrichment claim because it had not yet been determined whether express contract existed).

A review of the Complaint in this matter shows that Franzone makes no allegations questioning the validity of the DA. As the existence of the DA, which is the contract between

Franzone and Schmidt, is not in question, Franzone cannot plead alternative equitable theories of unjust enrichment and quantum meruit. Therefore, these claims will be dismissed from his Complaint.

## IV. CONCLUSION

For all of the reasons set forth above, I will partly grant Schmidt's motion and dismiss the class and collective action allegations from Franzone's Complaint, as well as the claims for unjust enrichment and quantum meruit. The remainder of Schmidt's motion will be denied, as I will decline to compel Franzone to arbitrate this matter, and I will decline to dismiss Franzone's claims under the PWPCL.